UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL NIEBOER,

    Plaintiff,                                    Hon. Janet T. Neff

v.                                                  Case No. 1:08-CV-1060

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 52 years of age at the time of the ALJ's decision. (Tr. 23, 61). He successfully completed high school and worked previously as a warehouse foreman, maintenance foreman/supervisor, and herdsman. (Tr. 79-84, 330).

Plaintiff applied for benefits on October 7, 2005, alleging that he had been disabled since November 15, 2004, due to conversion disorder.[1] (Tr. 61-63, 110). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 24-60). On February 1, 2008, Plaintiff appeared before ALJ James Carletti, with testimony being offered by Plaintiff, medical expert, Dr. Sidney Bolter, and vocational expert, Paul Delmar. (Tr. 327-52). In a written decision dated May 30, 2008, the ALJ determined that Plaintiff was not disabled. (Tr. 13-23). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 3-6). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

---

[1] At the administrative hearing, Plaintiff testified that he resumed working in July 2007 and, therefore, was only seeking benefits for the closed period from November 2004 through July 2007. (Tr. 330-31).

## RELEVANT MEDICAL HISTORY

On November 15, 2004, Plaintiff reported to an emergency room complaining of "chest pressure." (Tr. 136). The results of a physical examination were unremarkable and an EKG examination revealed "no evidence of ischemia." (Tr. 135-36). X-rays of Plaintiff's chest were "negative." (Tr. 141). Plaintiff participated in an exercise stress test, the results of which were "nonischemic." (Tr. 139-40). Plaintiff was admitted for observation and discharged on November 17, 2004. (Tr. 135).

The following day, Plaintiff returned to the hospital complaining of "chest tightness." (Tr. 152). Plaintiff participated in a heart catheterization procedure, the results of which were "normal." (Tr. 156). The doctor conducting this examination "recommend[ed] search for noncardiac cause of [Plaintiff's] chest pain." (Tr. 156). Plaintiff was discharged the following day in "stable" condition. (Tr. 151).

On December 17, 2004, Plaintiff participated in an MRI examination of his brain and internal auditory canals, the results of which were "normal." (Tr. 186). On December 28, 2004, Plaintiff participated in an MRA examination of his head, the results of which revealed "no high-grade stenosis or occlusions." (Tr. 194). The same day, Plaintiff participated in a CT scan of his chest, the results of which revealed "no evidence to support a pulmonary embolism." (Tr. 188). On December 29, 2004, Plaintiff participated in an MRI examination of his brain, the results of which revealed no evidence of "enhancing lesions," "acute infarct," or "intracranial hemorrhage." (Tr. 189-90). On December 30, 2004, Plaintiff participated in an echocardiogram examination, the results of which were "basically normal." (Tr. 196). On December 30, 2004, Plaintiff participated in an MRI examination of his internal auditory canals, the results of which were "unremarkable."

(Tr. 195). The same day, Plaintiff participated in an MRA examination of his neck, the results of which revealed "no evidence for hemodynamically significant stenosis." (Tr. 183).

On March 3, 2005, Plaintiff participated in an MRI examination of his pituitary gland, the results of which revealed no evidence of abnormality. (Tr. 221-22).

On March 23, 2005, Plaintiff was examined by Dr. Richard Unger. (Tr. 204-05). Plaintiff reported that he was experiencing dizziness. (Tr. 204). The results of the examination were unremarkable. (Tr. 204). Plaintiff exhibited "intact" coordination and a "steady" gait." (Tr. 205). The doctor concluded that Plaintiff's symptoms were of "unclear etiology." (Tr. 205).

On May 4, 2005, Plaintiff participated in a somatosensory evoked response examination of his lower extremities, the results of which revealed "slight asymmetrical conduction latencies. . .otherwise, the study is normal." (Tr. 185).

On June 22, 2005, Plaintiff was examined by Dr. Unger. (Tr. 200-01). Plaintiff reported that he continued to experience "dizziness and gait instability." (Tr. 200). The examination revealed no evidence of neuropathy. (Tr. 200-01). Plaintiff's coordination was "intact" and he exhibited "no signs of gait abnormality." (Tr. 201).

On August 17, 2005, Plaintiff was examined by Dr. Ronald Tusa. (Tr. 234-36). Plaintiff reported that he was experiencing "chronic dizziness" and "loss of balance." (Tr. 234). The results of a physical examination were unremarkable and Plaintiff exhibited "normal" coordination. (Tr. 235). Plaintiff participated in a battery of tests designed to assess his "balance and fall risk." (Tr. 226-31). Plaintiff exhibited "normal automatic postural responses to translational and pitch perturbations of the support surface." (Tr. 226). The doctor reported that Plaintiff's "observed behaviors suggest a non-physiological component to [the] results." (Tr. 226).

5

Dr. Tusa concluded that based on the results of the examination, Plaintiff possessed a "low risk for falls." (Tr. 226). The doctor also reported that "there is no evidence for a vestibular defect based on clinical and lab testing." (Tr. 236). Dr. Tusa concluded that "the etiology [of Plaintiff's reported symptoms] is unclear." (Tr. 235). (Tr. 235-36). The doctor "suggest[ed]' that Plaintiff was suffering from "conversion disorder."[2] (Tr. 236).

On October 17, 2005, Plaintiff completed a report regarding his activities. (Tr. 89-96). Plaintiff reported that he performed "chores around the house" such as "mowing grass, dishes, vacuuming, or laundry." (Tr. 89). Plaintiff reported that he also watches television, plays computer games, reads, prepares meals, shops, and cares for his cats and dog. (Tr. 89-92). Plaintiff further reported that he enjoys gardening, playing cards, and attending local sports events. (Tr. 93).

On November 14, 2005, Plaintiff participated in a consultive examination conducted by Dennis Mulder, Ed.D. (Tr. 161-65). Plaintiff reported that he "feels like he is drunk all the time and is unstable in his coordination." (Tr. 161). He reported that he "stumbles and falls" and "sometimes he sees double." (Tr. 161). Plaintiff reported that he also experiences "problems with his memory and concentration." (Tr. 161). Plaintiff reported that he "spends most of his time currently working in his yard, building an animal pen, caring for his calves, and doing household chores." (Tr. 162). Plaintiff exhibited "no posture or gait problems" and "no significant motor movement problems." (Tr. 162-63). The results of a mental status examination were unremarkable.

---

[2] Conversion disorder is a condition in which an individual exhibits "psychological stress in physical ways." *See* Conversion Disorder, *available at*, http://www.mayoclinic.com/health/conversion-disorder/DS00877 (last visited on Oct. 12, 2009). This impairment "usually appears suddenly after a stressful event." The "symptoms can be severe, but for most people, they get better within a few weeks." *Id.*

(Tr. 163-64). Plaintiff was diagnosed with "mild" anxiety disorder and depressive disorder. (Tr. 164). His GAF score was rated as 55-60.[3] (Tr. 164).

On May 15, 2006, Plaintiff was examined by Dr. Kevin Kerber. (Tr. 301-04). Plaintiff reported that he experienced dizziness, which felt "as though he just drank a 12 pack of beer." (Tr. 301). Plaintiff's wife reported that Plaintiff "does not appear to be walking like he is drunk, but he does occasionally veer to one side." (Tr. 301). Plaintiff reported that his symptoms "began a year and a half ago rather abruptly. . .while working as a supervisor at a funeral home." (Tr. 301). Plaintiff reported that his symptoms improve "if he gets a good night sleep," but worsen with heat or increases in stress. (Tr. 301). The results of a neurological examination were unremarkable. (Tr. 302-03). Plaintiff exhibited "normal" strength and coordination. (Tr. 303). Plaintiff's gait was "entirely normal up until he was asked to walk in tandem," at which point Plaintiff experienced difficulty. (Tr. 303). Dr. Kerber noted, however, that Plaintiff's "impairment of walking in tandem is atypical for known balance disorders." (Tr. 303). The doctor concluded that Plaintiff's "symptoms therefore remain unexplained neurologically." (Tr. 303). Dr. Kerber instructed Plaintiff to get adequate sleep, eat regularly, reduce his stress, and engage in cardiovascular exercise. (Tr. 303).

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 55-60 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from somatoform disorder,[4] a severe impairment that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 15-18). The ALJ concluded that while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations. (Tr. 18-23). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a

---

[4] Somatoform disorders represent a group of disorders characterized by physical symptoms suggesting a medical disorder. *See* Somatoform Disorders, *available at*, http://emedicine.medscape.com/article/294908-overview (last visited Oct. 12, 2009). Somatoform disorders represent a psychiatric condition because the physical symptoms present in the disorder cannot be fully explained by a medical disorder, substance use, or another mental disorder. The patient's physical symptoms can dramatically improve with successful treatment of the anxiety or mood disorder. Conversion disorder is one of several specific somatoform disorders. *Id.*

[5] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work[6] in which he was limited to nonpublic, simple, unskilled tasks with minimal interaction with coworkers and supervisors. (Tr. 18). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a

---

[6] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983).

significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Paul Delmar.

The vocational expert testified that there existed approximately 64,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 347-50). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006) (870 jobs in region constitutes a significant number).

a. The ALJ Properly Assessed the Medical Evidence

Plaintiff asserts a single issue on appeal, that the ALJ failed to accord sufficient weight to the opinions expressed by two of his treating physicians: (1) Nelson Zwaanstra, Ph.D. and (2) Dr. Katherine Jawor.

1.  Dr. Zwaanstra

On January 27, 2006, Dr. Zwaanstra completed a report concerning Plaintiff's ability to perform non-exertional work-related activities. (Tr. 294-96). The doctor characterized as poor, Plaintiff's ability to maintain attention/concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 294-95). The doctor characterized as fair, Plaintiff's ability to relate to co-workers, deal with the public, and function independently. (Tr. 294). Dr. Zwaanstra reported that Plaintiff possessed no ability to deal with work stresses. (Tr. 294). The doctor characterized as good, Plaintiff's ability to use judgment. (Tr. 294). The doctor characterized as unlimited/very good, Plaintiff's ability to follow work rules, interact with supervisors, and understand, remember, and carry out complex job instructions. (Tr. 294-95). Plaintiff asserts that because Dr. Zwaanstra was his treating physician, the ALJ was obligated to afford controlling weight to his opinions, which Plaintiff asserts evidence his disability.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232,

235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

The ALJ accorded limited weight to Dr. Zwaanstra's opinion. Specifically, the ALJ concluded that

> the opinion of this doctor appears on a fill-in-the-blank form, with only marginal notes attached to it. The doctor failed to cite any medical testing results or objective observations to support his conclusions as to the claimant's residual functional capacity. Furthermore, the opinion of this doctor, who assessed the claimant with the marked mental limitations, is not afforded any significant weight as this opinion conflicts with the substantial evidence of record, documenting less severe limitations. The doctor did not adequately consider the entire record, including the statements of collateral sources and the objective findings of other treating physicians. The objective evidence in the record does not support the level of severity that this doctor assigns.

(Tr. 21) (internal citation omitted).

As the ALJ properly concluded, the record simply fails to support such extreme limitations. During his various examinations, Plaintiff primarily reported experiencing *physical* symptoms. Dr. Zwaanstra is not a medical doctor and has not attempted to assess Plaintiff's physical limitations. To the extent that Plaintiff reported experiencing, or Plaintiff's care providers observed, non-exertional symptoms, such do not support the limitations articulated by Dr. Zwaanstra. The Court recognizes that Plaintiff allegedly suffered from a disorder in which he experienced non-exertional impairments that manifested themselves as physical symptoms.

13

However, there is no evidence in the record that the non-exertional impairments that triggered the physical symptoms Plaintiff allegedly experienced were as severe as suggested by Dr. Zwaanstra. The Court further notes that Plaintiff's reported activities are inconsistent with the limitations expressed by Dr. Zwaanstra. In sum, there exists substantial evidence to support the ALJ's decision to accord less than controlling weight to Dr. Zwaanstra's opinion.

### 2. Dr. Jawor

On January 27, 2006, Dr. Jawor completed a report concerning Plaintiff's ability to perform non-exertional work-related activities. (Tr. 297-99). Using the identical form, Dr. Jawor articulated the exact same limitations as Dr. Zwaanstra articulated above. The ALJ made no mention of Dr. Jawor's opinion in his decision. Plaintiff argues that the ALJ was required to accord controlling weight to Dr. Jawor's opinions because she was his treating physician.

As is well recognized, the treating physician doctrine "is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once." *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 506 (6th Cir. 2006). When assessing whether an opinion from a care provider is entitled to deference, the question is not whether the care provider later established a "treating physician" relationship with the claimant, but instead whether such relationship existed as of the date the opinion in question was rendered. As the Sixth Circuit has observed:

> But the relevant inquiry is not whether [the doctor] might have
> become a treating physician in the future if [the claimant] had visited
> him again. The question is whether [the doctor] had the ongoing

relationship with [the claimant] to qualify as a treating physician *at the time he rendered his opinion*."

*Id.*

Accordingly, "a single visit [to a care provider] does not constitute an ongoing treatment relationship." *Id.* Moreover, "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Id.* at 506-07.

Dr. Jawor reported that she first examined Plaintiff only eight days before rendering the opinion on which Plaintiff relies. (Tr. 299). The record indicates that when the doctor offered the opinion in question, she had examined Plaintiff on only this one occasion. Thus, even assuming that Dr. Jawor subsequently established a treating physician relationship with Plaintiff (something not supported by the present record), the opinion in question does not qualify as an opinion from a treating physician. Thus, the ALJ was not required to specifically address Dr. Jawor's opinion. *See Wilson*, 378 F.3d at 544-47. Furthermore, even if Dr. Jawor's opinion were entitled to deference, the result is the same. The opinion expressed by Dr. Jawor is identical to that expressed by Dr. Zwaanstra and is, therefore, properly rejected for the reasons discussed above.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

                                              Respectfully submitted,

Date:  October 30, 2009                       /s/ Ellen S. Carmody
                                              ELLEN S. CARMODY
                                              United States Magistrate Judge